## IN RE TORMES, RESPONDENT.

### PROCEEDINGS for Disbarment.

No. 14.—Decided July 10, 1922.

ATTORNEYS—SUSPENSION FROM PRACTICE—DISBARMENT.—The opinion analyzes the charges preferred and the evidence examined and it is concluded that there is a sufficient basis at least to suspend the respondent from practice for a period of two years.

The facts are stated in the opinion.

Messrs. *J. H. Brown, R. Martínez Nadal,* and *D. Sepúlveda* for the respondent.

Messrs. *J. E. Figueras, Fiscal,* and *A. Font, District Attorney,* for the Government.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

On February 10, 1922, the *fiscal* of this court, delegated by the Attorney General of Porto Rico, filed a complaint praying for the disbarment of attorney Leopoldo Tormes. The respondent raised several questions of law. Both parties were heard and by an order of March 24, 1922, the court overruled the motion to strike out and sustained the demurrer to the first two charges, granting the *fiscal* time within which to amend the complaint. See *In Re Tormes, ante,* p. 248. The complaint was amended and the case was

heard on the 2nd, 3rd and 4th days of May, 1922. The transcript of the stenographic notes was completed on the 26th of the same month and the case then came finally before the court for consideration and decision.

1. The complaint contains three counts, the first of which reads as follows:

"That in or about the month of April, 1921, attorney and notary Leopoldo Tormes García asked Miguel Almodóvar of Ponce to accomodate him with the sum of $3,000 under the false and fraudulent representation that although he had that amount deposited in his name on current account in the bank 'Crédito y Ahorro Ponceño,' it would not be convenient for him to withdraw it personally from the said bank, by that means inducing the said Almodóvar to supply the said sum of $3,000 in exchange for a check for that amount which attorney Tormes offered to give him on the bank 'Crédito y Ahorro Ponceño' so that he could draw the said sum of $3,000 from the current account of Tormes.

"That in his office the said Leopoldo Tormes García delivered to Almodóvar a check payable to him which reads as follows:

" 'Ponce, Porto Rico, April 9, 1921. No. 382.—The Crédito y Ahorro Ponceño, Ponce, P. R., will pay to the order of Miguel Almodóvar three thousand dollars. $3,000.00—(Signed) Leopoldo Tormes.'

"That believing the statements and false representations of attorney Leopoldo Tormes, the said Almodóvar went immediately with the said Tormes to the Bank of Ponce where Almodóvar drew from his savings account the sum of $3,000 and delivered it to the said attorney Leopoldo Tormes.

"That on April 12, 1921, the aforesaid check which attorney Tormes had given to Almodóvar drawn on the 'Crédito y Ahorro Ponceño' was deposited by Almodóvar in the Bank of Ponce to be credited to his savings account and the said Bank of Ponce sent the check to the 'Crédito y Ahorro Ponceño' for collection, but it was returned with the endorsement that Tormes had not sufficient funds.

"The *Fiscal* also alleges that the respondent committed the acts recited with the intention of deceiving the said Miguel Almodóvar and defrauding him of the said sum of $3,000; that the respondent knew when he drew the said check that he had not a current deposit

account in the Crédito y Ahorro Ponceño, for the sum of $3,000 necessary to meet the check and that at no other time had he had a similar amount on deposit in the said bank, and that the said Miguel Almodóvar parted with the said sum of $3,000 by reason of the false and fraudulent representations of the respondent.

"That the Bank of Ponce protested the said check before notary Eduardo Flores Colón.

"That the said check was finally returned to Almodóvar who on various occasions demanded of attorney Tormes payment of the $3,000 which it represented, but all efforts made by him to collect the said sum were fruitless."

The respondent answered as follows:

"That on April 9, 1921, the respondent borrowed from Miguel Almodóvar the sum of $3,000 without interest and to be returned opportunely, and received it from the said Almodóvar in the Bank of Ponce, which at that time was situated almost in front of the Crédito y Ahorro Ponceño; that on that date the respondent delivered to Miguel Almodóvar a check for an equal sum on the condition that he should present the said check for collection to the Crédito y Ahorro Ponceño only after notice to that effect from the respondent, inasmuch as the said Almodóvar knew, because the respondent so informed him at the time of the transaction, that on that day the latter had not that sum on deposit in his current account in the Crédito y Ahorro Ponceño. The respondent further alleges that when he drew the said check he had reasons to believe that the Crédito y Ahorro Ponceño would pay it although there was no such sum on deposit in his current account with the said bank and that the respondent has had on deposit in his current account with the said bank more than $4,000 and credit for short periods amounting to more than $12,000. The respondent also alleges that as Miguel Almodóvar knew that it was a loan of $3,000 that he had made to the respondent, he had acknowledged this publicly and privately, and that what he wanted was security for his money, which the respondent gave him, and furthermore, under the contract of security entered into for that amount the respondent paid to Almodóvar the sum of $1,000 on January 30, 1922, and has paid interest on that sum up to this date as agreed on in the deed of October 30, 1921, executed before notary M. Alberto Salicrup of Ponce."

The evidence examined is voluminous. Miguel Almodó-

var testified that he was one of the joint owners of some lands in Santa Isabel; that the owners had a lawsuit about the lease of the said lands to a sugar manufacturing company and Tormes was their attorney; that the case was decided against the owners and they finally sold the lands, Almodóvar receiving several thousand dollars which he had on deposit in the Bank of Ponce; that he continued to visit the office of his attorney to practice on the typewriter; that on April 9, 1921, while he was in the office, Tormes called him to his residence and said to him:

"That he needed some money on that day and desired the witness to cash a check for him for $3,000 because he did not want to draw that sum directly out of the Crédito y Ahorro Ponceño and that in doing so I would be perfectly safe. I at first refused, but afterwards thinking that I would lose nothing thereby, I cashed the check, that is, I took my savings account book, we went to the Bank of Ponce and I drew out the $3,000 and handed it to Tormes."

This witness was cross-examined at length by counsel for the respondent and adhered consistently to that statement of the facts. It seems advisable to transcribe the following from that cross-examination.

"Q. Tell me, witness, is it true that you had a conversation in Ponce with respondent Tormes on Saturday of last week?—A. I remember that he went to the store one day this week.

"Q. Is it true or not that he went to ask you that you should come to tell the truth?—A. I knew that.

"Q. Is it true that you then said to him that it was true that he had told you that he did not have sufficient funds in the bank and for that reason he wanted you to do him the favor not to present the check until Tuesday or Wednesday?—A. That is what he asked me to say.

"Q. Do you know Luciano Colón?—A. Luciano Colón? Yes.

"Q. On October 3rd of last year did you not make these same statements to Luciano Colón?—A. No.

"Q. Have you not talked today with Mrs. Tormes?—A. Yes.

"Q. Did you not repeat the same to her?—A. That was what she asked me to say.

The evidence shows that when the check drawn by Tormes was protested Almodóvar insistently demanded of Tormes the return of the $3,000, but without success. Finally on June 23, 1921, Almodóvar addressed a letter to the Attorney General informing him of the facts. In October of 1921 Tormes secured the payment of the said sum to Almodóvar by a mortgage. On the date of the trial Almodóvar had received $1,000 in part payment of the $3,000 and was receiving interest on the other $2,000.

The theory of the defense is that the transaction was simply a loan which Tormes could not pay in time, and much stress is laid on the statements of Almodóvar contained in the mortgage deed and the deed of partial cancelation. In fact, in the said deeds Almodóvar seems to admit that the transaction was a loan. In testifying under oath Almodóvar persisted that the statement that it was a loan was not true and said that he signed the deeds on the advice of notary Chardón who assured him that they would not injure him. Chardón testified that he had given Almodóvar that advice.

If Almodóvar's version is true, it is necessary to conclude that the act committed by Tormes partakes of the character of the crime of false representation. Almodóvar parted with his money and gave it to Tormes because he believed the latter's assertion that he had sufficient funds in his bank, and that assertion was made by Tormes knowing that it was false and for the purpose of obtaining the money.

Even if the version of Tormes is true, it can not be concluded that the transaction was really a loan. Analyzing the testimony of Tormes himself and even granting that he did not represent that he actually had funds in the bank, there would still be his assurance that he would have funds within two or three days, and as this did not prove to be true, it has all of the ear-marks of false representation. The evidence introduced by the respondent for the purpose of showing that he was about to receive a considerable sum of

money has not, in our opinion, the importance ascribed to it by the respondent, and the evidence that the check would be paid by the bank notwithstanding the fact that he had no funds on deposit there is not convincing.

Perhaps Tormes did not have the fixed intention of defrauding Almodóvar finally; but the evidence inevitably presents him as one who, needing a sum of money, is capable of resorting to any false or deceptive means for the purpose of obtaining it, as he actually did. Almodóvar's testimony merited the entire credence of the court.

2. Let us examine the second count. It reads as folows:

"That about the year 1919 Juan Laboy died as a result of a labor accident and his widow, Juana de Jesús, by attorney Leopoldo Tormes García, presented the corresponding claim to the Workmen's Relief Commission who, after the proper proceedings, allowed her an indemnity of $3,004.94 which was deposited with the Clerk of the District Court of Ponce and from it the sum of $1,314 was delivered to the mother of the minor children of Juan Laboy and $751.28 was paid to attorney Leopoldo Tormes García for his services.

"That on August 25, 1921, attorney Leopoldo Tormes García, in the name and on behalf of his client, Juana de Jesús, the widow of Juan Laboy, made a motion to the District Court of Ponce that the balance of $939.71 deposited with the Clerk of the District Court of Ponce and belonging to the minor children of Juan Laboy be delivered to her for the purpose of purchasing therewith a parcel of land and a house in the ward of Real of Ponce which Agustín Negrón offered to sell her for the sum of $900, alleging also that it was a good bargain and would benefit the minors who could thus have their own home and a means of obtaining some income from the products of the land.

"That the said motion was sustained and on the 9th of September, 1921, the Clerk of the District Court of Ponce drew check No. 302 payable to the order of Juana de Jesús on the 'Crédito y Ahorro Ponceño' for the sum of $934 and delivered it to attorney Leopoldo Tormes who, without the knowledge of said Juana de Jesús and without her signing, endorsing or making any mark on the said check, cashed it at the 'Crédito y Ahorro Ponceño' through his

agent, Eladio Ayala Moura, after having made a cross-mark on the back of the said check and writing under it the name of Juana de Jesús; and the said 'Crédito y Ahorro Ponceño' paid the check to the said Eladio Ayala Moura in cash, giving him forty-six twenty-dollar bills, one ten-dollar bill and four one-dollar bills.

"That after the said Leopoldo Tormes García had received the said $934 he appropriated it and used it for other purposes than those for which it was delivered to him, devoting it to the partial cancelation of a mortgage wherein the mortgagee was Angel Lomo, a resident of Ponce, and the mortgagor was Antonio Franceschini Rodríguez, and neither Juana de Jesús nor her children had any interest in that transaction.

"That all of this was done by respondent Leopoldo Tormes García without authority from or knowledge of the said Juana de Jesús and with the intention of defrauding her minor children of the said sum of $934."

The respondent admitted the first two paragraphs of the count and answered further as follows:

"Denying the rest of what is averred in the said count and alleging to the contrary that the check for $934 drawn by the Clerk of the District Court of Ponce on September 9, 1921, was delivered by the said clerk to the respondent in the morning of the said day, not to be delivered to Juana de Jesús, but for the purchase of a parcel of land and a house according to the order of the District Court of Ponce of September 9, 1921. That it was true that the respondent endorsed the said check and sent Eladio Ayala to cash it at the Crédito y Ahorro Ponceño, telling him to bring bills of large denomination, which he did, the respondent having signed the said check with his own name also under that of Juana de Jesús for the purpose of attending to and terminating the business of the purchase of the said house and lot which Agustín Negrón was to convey to her children Juan and Paula Laboy, the respondent to pay to the said Negrón the sum of $900 and deliver to Juana de Jesús the remaining $34 after deducting the expense of recording the deed; that the respondent did this by virtue of the express authorization and in accordance with the agency or trust of Juana de Jesús, and also to comply with the order of the court by virtue of which the check was drawn, and although it was made payable to the order of Juana de Jesús, it could have been drawn to the order of the respondent, as provided for by the order of the District

Court of Ponce of September 9, 1921, which is attached to the record of case No. 9948 instituted by Juana de Jesús. The said check was drawn by the Clerk of the District Court of Ponce to the order of Juana de Jesús because that was the instruction of the respondent when asked by the said clerk whether he wanted it made to his order or to the order of Juana de Jesús.

"That on the night of the 9th of September, 1921, something like a hurricane struck this Island and especially the southern part, and the rivers overflowed and destroyed properties and roads. That on the 9th of September, 1921, the respondent was waiting for Juana de Jesús to come from her residence in the ward of Anón of the municipality of Ponce, which is more than 12 kilometers distant from the city, it being necessary for her to cross rivers seven different times and there being no bridges or stone causeways and the roads being bad. That the said Juana de Jesús did not come to the city on that day, which was Friday, nor did she come on Saturday the 10th, Sunday the 11th or Monday the 12th of September, 1921.

"That at 2 p. m. on Monday the 12th of September, 1921, the respondent had to appear as attorney in the Federal Court, of which the acting judge was Hon. Emilio del Toro Cuevas, a Justice of this Court; that for this purpose and being desirous of complying with the order of the court and at the same time wishing to conclude the transaction between Juana de Jesús and Agustín Negrón, on Saturday the 10th of September, 1921, when it was nearly 11 a. m., and before the bank Crédito y Ahorro Ponceño would close, the respondent sent the said check to be cashed, asking for bills of large denomination as already stated; that on Sunday the 11th of September, 1921, it was still raining and blowing and under these circumstances and because the respondent had to be in San Juan on Monday the 12th and in Guayama on Tuesday the 13th to attend the first hearing in an action of unlawful detainer brought by Rosa Alvarez and others against Angel Cividanes, he left his business in charge of attorney Herminia Tormes, to whom the respondent delivered on Sunday the 11th of September, 1921, the sum of $934, the amount of the check in question, so that she should attend to the purchase and sale between Juana de Jesús and Agustín Negrón, none of whom knew how to sign and being persons little known in the city, they would otherwise have had great difficulty in cashing the said check."

We have examined carefully the copious evidence intro-

duced with regard to this count and in our opinion it is evident that the respondent, being in need of money to save a situation which could no longer be deferred, cashed, without the authorization of Juana de Jesús and by forging her mark, the said check which he had received for investment for the benefit of the minor children of Juana de Jesús and after collecting the money appropriated it to his own use for the purpose of meeting the situation to which we have referred, it being as follows: Angel Lomo lent to Antonio Franceschini the sum of $1,000 which the debtor secured by a mortgage. The debt not having been paid at maturity, the mortgagee brought an action for its recovery. At this juncture Franceschini sought Tormes and they went to Lomo's house to pay the debt one day in the month of January, 1921. Lomo was not at home. They went away without making the payment and Franceschini left the money with Tormes and returned to his home in Guayanilla. Some months passed and Tormes did not pay off the mortgage. The mortgagee again took the matter to the court and the debt was finally paid on September 10, 1921, at 7 p. m., a part of the payment being made with the $900 which Tormes had received in cashing the check which he had received for the minor children of Juana de Jesús.

With special relation to this count extraordinary efforts were made to show that the respondent was a victim of the district attorney. The court allowed the evidence to be examined without technical obstacle of any kind. It had before it the problem of assaying the conduct of one of its officers and desired to know the whole truth in the case. The young district attorney was attacked with ability, severity and insistency, and although he was shown to have committed acts which do not merit our approval, as, for example, the method employed to compel Juana de Jesús to appear before him as a witness, from the whole attack his figure stands out as that of an upright and unswerving official who confronts every obstacle and knows how to arrive at the goal. This

proceeding shows how difficult it is to prosecute the powerful, the influential, the man of brilliant intellect and education. It is due to these difficulties that so many injustices exist in society. And it is encouraging to find in society men strong of character and upright of mind who in the performance of their duties do not fear to take personal risks.

3. The third count refers to the fact that the respondent influenced one of the employees of this court for the purpose of obtaining knowledge of what would be the possible judgment of this court in a certain appeal before it was rendered.

As a general rule when a case is finally submitted one of the justices of the court studies it and prepares a memorandum which he submits to his colleagues. The memorandum is read, discussed, amended, rejected or approved, as the case may be. Naturally, until the judgment is signed the whole proceeding of study and discussion is secret. In doing their work the justices need the material aid of stenographers and typists and these employees also should guard the strictest secrecy. This is well known to all.

In this case it was shown that either by letter or by a conversation in Ponce with one of the stenographers of this court, Tormes ascertained the contents of a memorandum of an opinion given to the said stenographer by Associate Justice Del Toro to be typewritten. Tormes was an intimate friend of the employee and corresponded with him, and although the employee, who had ceased to be such when he testified, attempted to convince the court that wilfully and voluntarily he had conveyed the information to Tormes, the court believes that the employee yielded to the suggestions of Tormes. But even if this were not so, the fact would remain that Tormes, an attorney and officer of the court, accepted the information and instead of reporting the matter to the court, made use of the information for his personal purposes.

4. We will now consider several questions raised as "defenses" in the answer.

(*a*) The fact that the respondent was accused before a grand jury by the district attorney and that the district attorney himself moved to quash the first count and the grand jury refused to find an indictment on the second, can not preclude an investigation in these proceedings of the same facts by this court in order to judge of the conduct of the attorney. See the opinion delivered by this court in the same case on March 24, 1922.

(*b*) The fraudulent intent of the respondent follows from the acts charged in the second count and supported by the evidence. But even if this were not so, the facts alleged and proved in connection with the second count show immoral conduct on the part of the respondent in connection with the practice of his profession. The respondent was the attorney for the minors. Without inquiring into what was done with the money first received and considering only the money last received, it appears from the respondent's own testimony that although he had the opportunity to have the check drawn to his order, he asked that it be drawn to the order of Juana de Jesús. It being so drawn, he, without authority therefor, forged or caused to be forged thereon the cross-mark of Juana de Jesús—a falsity—and cashed the check, which then appeared to have been cashed by Juana de Jesús herself. And then he used the money for his own benefit. The fact that the money was returned later is of no importance. It was returned after the district attorney had taken action.

(*c*) The respondent referred to the length of time that he had been practicing the profession and the credit that he had as an attorney. Many persons testified in his favor. The respondent was a young letter-carrier who by worthy and perseverant efforts and in the midst of the sympathy of a whole community studied and made himself a lawyer. This has served to make the case more difficult and complex. It is distressing to witness the fall of one who ascended by such struggles. The natural tendency is to impede his fall.

But examining the particular acts investigated calmly, we are forced to the conclusions stated. Perhaps this attitude may be more salutary for the future career of the respondent than would be an attitude of charitable consideration. It is not enough to elevate oneself. It is necessary to maintain the moral altitude of the position attained.

The other "defenses" have been disposed of impliedly by what we have said.

5. Considering the pleadings and the evidence as a whole, we are of the opinion that there is a sufficient basis for suspending the respondent from the practice of his profession. And taking into account all of the attending circumstances, the period of suspension will be fixed at two years.

*Suspended for two years as attorney and notary.*

Justices Wolf, Aldrey, Hutchison and Franco Soto concurred.